O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NFC COLLECTIONS LLC, a Delaware limited liability company,<br><br>          Plaintiff,<br><br>    v.<br><br>DEUTSCHE BANK AKTIENGE-SELLSCHAFT, a business entity organized under the laws of Germany; DEUTSCHE BANK PRIVAT-UND GESCHAFTSKUNDEN AG, a business entity organized under the laws of Germany; and BAYRAKKALE LTD STI, a business entity organized under the laws of Turkey,<br><br>          Defendants.<br>_____ | Case No. CV 12-10718 DDP (JEMx)<br><br>**AMENDED ORDER DENYING MOTIONS TO DISMISS**<br><br>[Dkt. Nos. 22 & 24] |

    Presently before the court are Motions to Dismiss brought by Defendants Deutsche Bank Aktiengesellschaft ("DB AG") and Deutsche Bank Privat-und Geschaeftskunden AG s/h/a Deutsche Bank Privat-und Geschaftskunden AG ("DB Privat").

///

///

Case 2:12-cv-10718-DDP-JC Document 79 Filed 07/02/13 Page 2 of 33 Page ID #:1991

## I. Background

Plaintiff NFC Collections LLC ("NFC") is the successor-in-interest to Newbridge Film Capital, LLC ("Newbridge"). (Compl. ¶ 1.) Newbridge was engaged in the business of financing motion picture productions. (Id. ¶ 8.) NFC asserts that in 2010, a producer of animated motion pictures, Crest Animation Holdings, Inc. ("Crest"), approached Newbridge to participate in the financing of a motion picture entitled "Norm of the North" (the "Film"). (Id.) Bayrakkale, LTD STI ("Bayrakkale"), a company organized under the laws of Turkey and a named Defendant in this action, agreed to fund the production of the Film in the amount of $25,000,000, but required a $6,250,000 deposit "to enable it to obtain financing for its funding commitment." (Id.) Newbridge agreed to make a loan to Crest in the amount of $5,930,000, and Crest agreed to provide the remaining $320,000 to make the required deposit. (Id.) Bayrakkale agreed to secure repayment of the deposit with an irrevocable letter of credit, naming Newbridge as the beneficiary. (Id.)

As of November 18, 2010, Newbridge, Crest, and Bayrakkale entered into an escrow agreement (the "Escrow Agreement") with a law firm (the "Escrow Agent"). (Id. ¶ 11.) The escrow agreement provided:

(a) the Escrow Agent would act as an escrow agent for Newbridge, Crest, and Bayrakkale; (b) Newbridge would deposit $5,930,000 (the 'Newbridge Deposit') and Crest would deposit $320,000 (the 'Crest Deposit') into an escrow account set up by the Escrow Agent; c) after receiving notice from the Escrow Agent that Newbridge and Crest had made their respective

2

1    deposits into the escrow account, Bayrakkale would cause a
2    letter of credit in the amount of $6,562,500 to be issued by a
3    mutually agreed upon financial institution in favor of
4    Newbridge as the beneficiary and to be delivered by the Escrow
5    Agent...;and (d) upon satisfaction of certain conditions, the
6    Escrow Agent would disburse the Newbridge and Crest Deposits
7    to Bayrakkale and deliver the original Letter of Credit to
8    Newbridge.

9    (Id.)

10       The parties agreed the Letter of Credit ("LOC") would be
11   issued by Deutsche Bank,[1] and on January 12, 2011, "Deutsche Bank
12   wrote a letter to Bayrakkale stating that its request to issue a
13   letter of credit in favor of Newbridge was being processed and that
14   it expected to issue the letter of credit the following week."
15   (Id. ¶ 12.)  On January 26, 2011, Vincent Nuccio, Jr. ("Nuccio"), a
16   shareholder of the law firm, the Escrow Agent, "went to the offices
17   of Deutsche Bank in Dortmund, Germany,[2] where he received an
18   original, executed letter confirming that the Letter of Credit was
19   ready to be issued and would be ready for collection on January 27,
20   2011."  (Id. ¶ 13.)  Later that day, Newbridge and Crest each wired
21   their deposits to the escrow account, and Nuccio notified
22   Bayrakkale that the deposits had been received.  (Id. ¶ 14.)  On
23   January 27, 2011, Nuccio went back to the Deutsche Bank in
24   Dortmund, Germany, and received the original, executed LOC and

25   _____

26       [1] Defendant states that this Bank was DB Privat. Plaintiff
27   does not state this in the Complaint. Plaintiff refers to DB AG and
     DP Private as one entity, "Deutsche Bank."

28

1  notified and provided copies to Newbridge, Crest, and Bayrakkale.

2  (Id., Exh. 1.)

3      The LOC "provides that it shall be paid upon presentation by

4  Newbridge, at any counter of Deutsche Bank worldwide...." (Id. ¶

5  18; DB AG's Motion to Dismiss ("DB AG Motion"), Exh. 1.)  On or

6  about April 12, 2011, Newbridge presented the LOC and the required

7  certificate to Deutsche Bank in New York, New York.  (Compl. ¶ 18.)

8  On or about May 26, 2011, Deutsche Bank rejected the draw on the

9  LOC on the grounds "that the Letter of Credit was 'neither validly

10  issued by Deutsche Bank Privat-und Geschaftskunden AG nor

11  recognized in its books.'"  (Id. ¶ 19.)

12      NFC brought this action against Defendants DB AG and DB Privat

13  for failure to honor the letter of credit, negligence, negligent

14  misrepresentation, and aiding and abetting fraud.[3]  DB Privat is a

15  wholly owned subsidiary of DB AG.  (Id. ¶ 1.)

16      Defendant DB AG moves to dismiss on the grounds of forum non

17  conveniens, NFC's lack of standing, and NFC's failure to assert any

18  plausible claims against DB AG. DB Privat moves to dismiss on the

19  grounds of forum non conveniens and lack of personal jurisdiction.

20  **II. Legal Standard**

21      Federal Rule of Civil Procedure 8(a)(2) requires a complaint

22  to contain "a short and plain statement of the claim showing that

23  the pleader is entitled to relief."  The purpose of the rule is "to

24  give the defendant fair notice of what the claim is and the grounds

25  upon which it rests."  Bell Atlantic Corp. v. Twombly, 550 U.S.

26

27      [3] NFC also brought this action against Bayrakkale LTD STI

28  ("Bayrakkale") for fraud and unjust enrichment. It appears
    Bayrakkale has not been served yet.

544, 555 (2007) (alteration and internal quotation marks omitted). Though a complaint "does not need detailed factual allegations, . . . a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (alteration, citations, and internal quotation marks omitted).

In considering a motion to dismiss, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Id. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw upon its judicial experience and common sense." Id. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Twombly, 550 U.S. at 556 (internal quotation marks omitted).

///

///

///

5

III. Discussion
    A. DB AG's Motion to Dismiss
        1. Forum Non Conveniens
    "[A] plaintiff's choice of forum should rarely be disturbed."
Piper Aircraft Co. V. Reyno, 454 U.S. 235, 241 (1981). When
considering a motion to dismiss on the grounds of forum non
conveniens, the court must examine: "(1) whether an adequate
alternative forum exists, and (2) whether the balance of private
and public interest factors favors dismissal." Lueck v. Sundstrand
Corp., 236 F.3d 1137, 1142 (9th Cir. 2001). Moreover, "a
plaintiff's choice of forum is entitled to greater deference when
the plaintiff has chosen the home forum." Piper Aircraft, 454 U.S.
at 255.

    Generally, an adequate alternative forum exists when "the
Defendant is 'amenable to process' in the other jurisdiction."
Piper Aircraft, 454 U.S. at 255 n.22 (quoting Gulf Oil Corp. v.
Gilbert, 330 U.S. 501, 506-07 (1947)). Although this requirement
is easily satisfied, "[i]n rare circumstances...where the remedy
offered by the other forum is clearly unsatisfactory," the other
forum may not be an adequate alternative. Id. Dismissal would not
be appropriate if, for example, the other forum does not permit
litigation of the subject matter in dispute. Id.

    Even when an adequate alternative forum exists, the court will
not "disturb the plaintiff's original choice of forum unless the
private interest and the public interest factors strongly favor
dismissal." Tuazon v. R.J. Reynolds Tobacco Co., 433 F.3d 1163,
1181 (9th Cir. 2006) (internal quotation marks omitted).
Defendants must make "a clear showing of facts which establish such
oppression and vexation of a defendant as to be out of proportion

6

1  to plaintiff's convenience."   Boston Telecomm. Group, Inc. v. Wood,

2  588 F.3d 1201, 1206 (9th Cir. 2009).

3  **i. Adequate Alternative Forum**

4  **a. Service of Process**

5  DB AG asserts Germany is an adequate alternative forum because

6  DB AG is "amenable to process" in Germany.  (DB AG Mot. at 5.)  NFC

7  concedes DB AG is amenable to process in Germany but argues Germany

8  is not an adequate forum because DB AG did not prove Bayrakkale to

9  be amenable to process in Germany. (Opp. to DB AG's Mot. to Dismiss

10 ("Opp. to DB AG") 10-11.)  DB AG argues Bayrakkale is not a party

11 to any of the claims against DB AG and has not been served in this

12 matter, making the argument irrelevant to DB AG's motion to

13 dismiss. (DB AG's Reply to NFC's Opposition ("DB AG Reply") 4.)

14 The court has insufficient information to determine whether

15 Bayrakkale is amenable to process in Germany.  However, because

16 Bayrakkale has yet to be served in this action, the court finds it

17 is not dispositive.

18 **b. Statute of Limitations**

19 NFC asserts that Germany is not an adequate forum because its

20 claims may be time-barred in Germany.  Under California law, a one

21 year statute of limitations applies. NFC claims a German court may

22 not toll the statute of limitations thus barring the claims.  DB AG

23 contends that NFC's tort claims are governed by German law, under

24 which the statute of limitations is three years.  To determine

25 whether Germany is an adequate alternative forum in regards to the

26 statute of limitations, the court must first determine which law

27 applies.

28 **1. Choice of Law**

7

In determining which body of law or rule applies to a standby
letter of credit, three major sources may apply: (1) International
Chamber of Commerce, Uniform Customs and Practices for Documentary
Credits, Publication Numbers 500 and 600 ("U.C.P."); (2) the
Uniform Commercial Code ("U.C.C."); (3) and the International
Standby Practices ("ISP 98"). 7 Bus. & Com. Litig. Fed. Cts. §82:8
(3d. Ed).  In addition, "the common law rules of contract
construction, where they are not inconsistent with the U.C.P.,
U.C.C., or I.S.P., may be used to examine the terms of a letter of
credit, to determine whether any of the terms are ambiguous, and to
resolve any perceived ambiguity."  Id.

ISP98 does not have a default choice of law rule, as it
represents a commercial agreement on the "terms and conditions of a
contractual relationship rather than a body of law." Jeffrey S.
Wood, Drafting Letters of Credit: Basic Issues Under Article 5 of
the Uniform Commercial Code, UCP 600, and ISP98, 125 Banking L.J.
103, 110 (February 2008).  ISP98 "attempts to shield an issuer from
economic harm if the credit is structured to be subject to, or is
determined by a court to be subject to, the laws of a jurisdiction
other than the jurisdiction in which the issuer is located.  Id.
Under ISP98 Rule 1.08(d), "[a]n issuer is not responsible
for...observance of law or practice other than that chosen in the
standby or applicable at the place of issuance."  Id.

"In diversity cases, federal courts must apply the conflict-
of-law principles of the forum state."  S.A. Empresa De Viacao
Aerea Rio Grandense v. Boeing Co., 641 F.2d 746, 749 (9th Cir.
1981).  This is a diversity case in the Central District of
California; therefore, the court applies California's principles.

1    When an agreement provides a choice of law provision,
2 California courts apply "the law of the state chosen by the parties
3 . . . unless . . . the chosen state has no substantial relationship
4 to the parties or the transaction and there is no other reasonable
5 basis for the parties' choice." <u>Nedlloyd Lines B.V. v. Superior</u>
6 <u>Court</u>, 3 Cal. 4th 459, 465 (1992); <u>See also Hoffman v. Citibank</u>
7 <u>(South Dakota) N.A.</u>, 546 F.3d 1078, 1082 (9th Cir. 2008).  A
8 substantial relationship exists, for example, "when one of the
9 parties is domiciled in the chosen state." <u>Nedlloyd</u>, 3 Cal. 4th at
10 467 (internal quotations omitted).  If there is a substantial
11 relationship or reasonable basis for the parties' choice, the court
12 must "determine whether the chosen state's law is contrary to a
13 fundamental policy of California." <u>Id.</u> at 466; <u>See also</u> <u>Bridge</u>
14 <u>Fund Capital Corp. v. Fastbucks Franchise Corp.</u>, 622 F.3d 996, 1002
15 (9th Cir. 2010).  If there is no conflict, "the court shall enforce
16 the parties' choice of law." <u>Id.</u>  If, however, a conflict exists,
17 "the court must then determine whether California law has a
18 materially greater interest than the chosen state in the
19 determination of the particular issue." <u>Id.</u> (internal quotations
20 omitted); <u>See also</u> <u>Hoffman</u>, 546 F.3d at 1082.
21    These "rules apply regardless of whether the dispute arises
22 out of contract or tort." <u>S.A. Empresa</u>, 641 F.2d at 749.  A choice
23 of law provision "which provides that a specified body of law
24 'governs' the 'agreement' between the parties, encompasses all
25 causes of action arising from or related to that agreement,
26 regardless of how they are characterized, including tortious
27 breaches of duties emanating from the agreement or the legal
28 relationships it creates." <u>Nedlloyd</u>, 3 Cal. 4th at 470.

The court finds that California law governs both NFC's contract and tort claims alike.  Newbridge and the LOC in dispute have a substantial relationship to California.  Newbridge, the beneficiary of the LOC, was a citizen of California at the time it was issued.  Although neither Crest nor Newbridge is a named plaintiff in this action, and Newbridge no longest exists, NFC is the successor-in-interest to Newbridge.  The court thus looks upon NFC as it would Newbridge.  Additionally, Crest, another citizen of California, participated in negotiating the transaction and ultimately wired the money to the Escrow Agent in exchange for the LOC.  It is clear the LOC was issued for and negotiated by several entities, most of which do business and exist under the laws of California.

Furthermore, the court finds that NFC's tort claims arise out of and are related to the LOC. If the LOC had not issued, the tort claims would not exist.  The LOC is at the core of NFC's tort claims.  Therefore, the court will apply California law to the entire action.[4]

## 2. Whether Germany is an adequate forum regarding Statute of Limitations

Under California law, a one year statute of limitations applies. This statute of limitations may be imposed on NFC's claims if the case was brought in Germany, and a German court may or may not toll the statute of limitations.[5]  NFC contends that "[u]nder

---

[4] The court notes this does not answer the question of what law would be used under a German conflict of law analysis.  The court declines to speculate on this issue.

[5] DB AG did not contest NFC's interpretation of Germany's
(continued...)

German law, a statute of limitations is tolled by a foreign action only if the foreign action was brought in a court that has international jurisdiction, which requires the foreign forum to have a sufficient connection to the case." (Opp. to DB AG at 11.) NFC argues it may be "foreclosed from any remedy. . .if a German court found this court lacks a sufficient connection to the case." (Id.) The uncertainty regarding the statute of limitations weighs against Germany's adequacy as a forum.

### ii. Private Interest Factors

In evaluating private interest, the court considers seven factors:

> (1) the residence of the parties and witnesses, (2) the forum's convenience to the litigants, (3) access to physical evidence and other sources of proof, (4) whether unwilling witnesses can be compelled to testify, (5) the cost of bringing witnesses to trial, (6) the enforceability of the judgment, (7) any practical problems or other factors that contribute to an efficient resolution.

Boston Telecomm., 588 F.3d at 1206.

DB AG contends "the vast majority of evidence and witnesses are in Germany where the [LOC] was allegedly negotiated and issued and where the two individuals . . .who purportedly signed the [LOC] on behalf of DB Privat were allegedly located." (DB AG Motion at 6.) DB AG also argues any judgment obtained against DB AG is enforceable in Germany.

---

[5](...continued)
tolling rules. DB AG only argued that German law governed the statute of limitations.

1   NFC concedes "primary residences of the parties balance out"
2   but points out that Newbridge and Crest's management's staff, who
3   are primary witnesses, are located in California. (Opp. to DB AG at
4   11-12.)  NFC also argues that while Germany may be more convenient
5   for DB AG, DB AG has been a party to 50 lawsuits in California, and
6   that unlike NFC which has no ties to Germany, DB AG is well-
7   equipped to handle litigation in California. (Id.)  NFC also
8   contends Germany does not allow pre-trial discovery, in particular
9   deposition testimony, forcing NFC's witnesses to travel to Germany.
10  (Id. at 13, n.3.) NFC argues DB AG's cost of bringing witnesses to
11  California is not minimally relevant because they can be deposed at
12  minimal cost in Germany and are not required to be present in
13  California. (Id. at 14.)

14      The court finds private interest factors do not weigh in favor
15  of dismissal. While under United States' rules any and all of DB
16  AG's witnesses may be deposed in Germany, under Germany's pre-trial
17  discovery, NFC's witnesses would have to travel to Germany to be
18  heard.  The cost of traveling to Germany for a trial is
19  substantially greater than the cost of deposing witnesses.
20  Moreover, DB AG has a significant presence in California, while NFC
21  has no presence at all in Germany.  On balance, this forum is more
22  convenient to the litigants.

23                    **iii. Public Interest Factors**
24      In evaluating public interest, five factors are considered:
25  "(1) the local interest in the lawsuit, (2) the court's familiarity
26  with the governing law, (3) the burden on local courts and juries,
27  (4) congestion in the court, and (5) the costs of resolving a
28  dispute unrelated to a particular forum." Boston Telecomm., 588

                                    12

F.3d at 1206.

DB AG argues public interest factors also weigh in favor of dismissal, particularly because Germany has a local interest in regulating its banks and regulating conduct that occurred in its jurisdiction.  (DB AG Reply at 8.)  DB AG argues that NFC "has not alleged a single transaction or action that took place in California." (DB AG Motion at 6.)  DB AG also argues NFC's claims are subject to German law, since the transaction occurred in Germany.

NFC responds that California has a local interest in this lawsuit because the transaction involved a $25 million California motion picture production in which a California resident was essentially put out of business, and "California has a strong interest in maintaining a stable and successful film business in addition to providing an effective forum for its residents." (Opp. to DB AG at 15.)  NFC also argues the court is more familiar with California law, which governs the LOC, and thus there would not be an unfair burden on the court because California has a substantial connection to the case.  (<u>Id.</u>)

Although the court agrees that Germany has a significant local interest in this action, California also has a significant interest given that California law governs the LOC.  DB AG's argument that the entire transaction took place in Germany is not persuasive. Although the LOC was issued in Germany, negotiations took place from California to create the terms of the LOC and the effects of the LOC were felt most in California.

For these reasons the court declines to disturb plaintiff's original choice of forum.  Neither private nor public factors weigh

1   in favor of dismissal on the grounds of forum non conveniens.

2              **2. Standing**

3       DB AG argues NFC, as a successor-in-interest, lacks standing

4   to assert its claims because under the International Standby

5   Practices ("ISP 98") and California Commercial Code 5114(c), an

6   assignment of a letter of credit confers no rights unless the

7   issuer consents to the assignment.  (DB AG Motion 8-9.)  NFC argues

8   a successor-in-interest is not the same as an assignee. The court

9   agrees.

10      In Export-Import Bank of the U.S. v. United Cal. Discount

11  Corp., 738 F.Supp.2d 1047 (C.D. Cal. 2010), the defendant argued

12  the plaintiff lacked standing because it was not a party to the

13  Letters of Credit at issue or any other agreement.  The court held

14  that the plaintiff had standing because it was assigned "the

15  complete bundle of rights," including the rights to a cause of

16  action against defendant.  Id.

17      The court finds that as a successor-in-interest NFC is not

18  simply an assignee and was similarly assigned the right to a cause

19  of action against DB AG.  The court finds that NFC has standing to

20  bring this action.

21           **3. Failure to State a Claim**

22      DB AG asserts that NFC has failed to plead its four causes of

23  action sufficiently. DB AG argues primarily that although the

24  complaint refers to DB AG and DB Privat collectively as "Deutsche

25  Bank," the conduct underlying the causes of action is attributable

26  only to DB Privat. As a consequence, to find DB AG liable for the

27  conduct of DB Privat, the court must consider the relationship

28  between the two entities.

                              14

1    The Complaint asserts two theories for finding that the

2   relationship is such that DB AG may be liable for the acts of DB

3   Privat: DB Privat is "an alter ego" of DB AG, (Compl. ¶ 3), or DB

4   Privat is "the actual or ostensible agent" of DB AG, (id. ¶ 5).

5   Before considering the four causes of action, the court addresses

6   the allegations of these two relationships.

7                      **i. Liability of DB AG**

8                          **a. Alter ego**

9    The Complaint alleges that "DB Privat is a wholly owned

10  subsidiary and an alter ego of DB [AG]. In particular, DB [AG]

11  controls the management of DB Privat; appoints members to, and has

12  common members on, DB Privat's supervisory board; takes the profits

13  and is obligated to absorb the losses of DB Privat; and shares

14  certain assets with DB Privat." (Compl. ¶ 3.) In response, DB AG

15  asserts that NFC's "conclusory statement that DB AG is DB Privat's

16  alter ego does not satisfy the requirement that claims be

17  plausible." (DB AG's Motion 8:15-16.) The court disagrees.

18   "Like other shareholders, a parent company is presumed to have

19  an existence separate from its subsidiaries. Accordingly, the mere

20  fact that it owns the stock of the subsidiary will not suffice to

21  prove that the two entities are alter egos of one another; rather,

22  the evidence must show that the wholly-owned subsidiary is merely a

23  conduit for, or is financially dependent on, the parent

24  corporation." Nielson v. Union Bank of Cal., N.A., 290 F. Supp. 2d

25  1101, 1116 (C.D. Cal. 2003).

26   To "satisfy the alter ego exception to the general rule that a

27  subsidiary and the parent are separate entities, the plaintiff must

28  make out a prima facie case (1) that there is such unity of

                                    15

interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice." <u>Doe v. Unocal Corp.</u>, 248 F.3d 915, 926 (9th Cir. 2001) (alterations and internal quotations marks omitted).

### 1. Unity of interest and ownership

The first alter ego component is met if the parent company is shown to control the subsidiary "to such a degree as to render the latter the mere instrumentality of the former." <u>Unocal Corp.</u>, 248 F.3d at 926 (quoting <u>Calvert v. Huckins</u>, 875 F. Supp. 674, 678 (E.D. Cal. 1995)). This relationship is established, for example, where "the parent dictates every facet of the subsidiary's business-from broad policy decisions to routine matters of day-to-day operation." <u>Id.</u> (alterations and internal quotation marks omitted). The Ninth Circuit has explained, however, that "a parent corporation may be directly involved in the activities of its subsidiaries without incurring liability so long as that involvement is consistent with the parent's investor status." <u>Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.</u>, 328 F.3d 1122, 1135 (9th Cir. 2003).

"Ownership is a prerequisite to alter ego liability." <u>S.E.C. v. Hickey</u>, 322 F.3d 1123, 1128 (9th Cir. 2003). "Among the factors to be considered in applying the [alter ego] doctrine are commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other." <u>Wady v. Provident Life and</u>

1  <u>Accident Ins. Co. of Am.</u>, 216 F. Supp. 2d 1060, 1066 (C.D. Cal.

2  2002); <u>see also</u> <u>Associated Vendors, Inc. v. Oakland Meat Co.</u>, 26

3  Cal. Rptr. 806, 813-15 (Ct. App. 1962) (listing factors considered

4  in California).

5        Here, NFC points to a "Control and Profit-Transfer Agreement"

6  between DB AG and DB Privat. Section 1.1 of that agreement provides

7  as follows:

8        The Parent Company shall . . . be entitled to issue

9        instructions to the Directors of the Subsidiary Company

10       as regards management of the company. The Subsidiary

11       Company undertakes to follow instructions issued by the

12       Parent Company. Management and representation of the

13       Subsidiary Company shall continue to be the

14       responsibility of the Directors of this company. The

15       Parent Company shall take note of the existing sole

16       responsibility of the Directors of the Subsidiary Company

17       . . . when issuing instructions.

18 (Gans Decl. Exh. G.) Sections 2 and 3 of the agreement provide,

19 respectively, that "[t]he Subsidiary Company undertakes to pay all

20 of its profits to the Parent Company for the term of this

21 agreement" and that "the Parent Company shall be obliged to absorb

22 the Subsidiary Company's losses . . . ." (<u>Id.</u>) NFC also points to

23 Hermann-Joseph Lamberti, a member of DB AG's board who "also was

24 chairman of every committee of the supervisory board of DB Privat,

25 including (i) the executive committee, (ii) the auditing committee,

26 and (iii) the committee for credit and market risks." (Opp. to DB

27 Privat 5:2-6.) In addition, NFC asserts that DB AG and DB Privat

28 share certain assets, including a website, an email network, and

1    litigation counsel. (<u>Id.</u> at 5:9-10.) NFC concludes that it "has

2    alleged that DB AG acts as far more than an investor, <u>i.e.</u> it

3    controls management, takes all profits, absorbs all losses, has

4    common directors and shares assets, all specific attributes of

5    alter egos." (Opp. to DB AG 23:27-24:1.)

6         The court agrees. For the purposes of a 12(b)(6) motion, NFC

7    has sufficiently pleaded factual allegations that DB AG is more

8    than a mere investor in DB Privat. NFC has presented facts showing

9    that DB AG has discretion to control the operations of DB Privat,

10   takes the profits and is liable for the losses of DB Privat, shares

11   assets with DB Privat, and has common board members with DB Privat.

12                        **2. Fraud or injustice**

13        The second component is satisfied either by "evidence of any

14   fraudulent intent in forming the corporation" or if "substantial

15   injustice" will result from respecting the corporate separateness.

16   <u>Seymour v. Hull & Moreland Eng'q</u>, 605 F.2d 1105, 1112-13 (9th Cir.

17   1979). The inability to collect a judgment "does not, by itself,

18   constitute an inequitable result" amounting to substantial

19   injustice. <u>Id.</u> at 1113.

20        NFC asserts that a failure to disregard the separate

21   identities of DB AG and DB Privat would allow DB AG to shield

22   itself from the consequences of DB Privat's conduct. (Opp. to DB AG

23   24:8-10.) NFC concludes that "failing to impose alter ego liability

24   on DB AG would inequitably enable it to limit its liability for

25   illegal acts by performing them through its controlled division, DB

26   Privat." (<u>Id.</u> at 24:13-15.) The court finds that NFC has

27   sufficiently pleaded injustice.

28        In sum, the court finds that NFC has pleaded a prima facie

                                      18

1  case that DB AG and DB Privat are alter egos.

2  **b. Ostensible agency**

3      The Complaint also alleges that DB AG and DB Privat acted as
4  the ostensible agents of each other. (Compl. ¶ 5.) "In the case of
5  agency, 'the question is not whether there exists justification to
6  disregard the subsidiary's corporate identity, the point of the
7  alter ego analysis, but instead whether the degree of control
8  exerted over the subsidiary by the parent is enough to reasonably
9  deem the subsidiary an agent of the parent under traditional agency
10 principles." <u>Fru-Con Const. Corp. v. Sacramento Municipal Utility</u>
11 <u>Dist.</u>, No. CIV.S-050583 LKK/GGH, 2007 WL 238481, at *3 (E.D. Cal.
12 Aug. 17, 2007) (quoting <u>Sonora Diamond Corp. v. Super. Ct.</u>, 83 Cal.
13 App. 4th 523, 541 (2000)).

14     In California, "[a]n agency is ostensible when the principal
15 intentionally, or by want of ordinary care, causes a third person
16 to believe another to be his agent who is not really employed by
17 him." Cal. Civ. Code § 2300. "Ostensible authority is such as a
18 principal, intentionally or by want of ordinary care, causes or
19 allows a third person to believe the agent to possess." <u>Id.</u> § 2317;
20 <u>see also</u> Restatement (Third) of Agency § 2.03 (2006) ("Apparent
21 authority is the power held by an agent or other actor to affect a
22 principal's legal relations with third parties when a third party
23 reasonably believes the actor has authority to act on behalf of the
24 principal and that belief is traceable to the principal's
25 manifestations.").

26     An agent acting with ostensible or apparent authority may bind
27 a disclosed principal to contracts with third parties. Cal. Civ.
28 Code § 2330 ("An agent represents his principal for all purposes

within the scope of his actual or ostensible authority, and all the
rights and liabilities which would accrue to the agent from the
transaction within such limit, if they had been entered into on his
own account, accrue to the principal."); see also Restatement
(Third) of Agency § 6.01 ("When an agent acting with actual or
apparent authority makes a contract on behalf of a disclosed
principal, (1) the principal and the third party are parties to the
contract; and (2) the agent is not a party to the contract unless
the agent and third party agree otherwise.").

In other words, if DB Privat was the ostensible agent of DB
AG, as the Complaint alleges, then the obligations that accrued to
DB Privat under the LOC may have also accrued to DB AG.

The court finds that Newbridge had reason to believe DB Privat
was an ostensible agent of DB AG. First, the LOC expressly provided
that Newbridge could present its documents to "any counter[] of
Deutsche Bank AG worldwide." (Nuccio Decl. Exh. J.) Second, the
words "Deutsche Bank" appear in the top right corner of each page
of the LOC accompanied by the logo that appears on DB AG's website
and securities registration document. (Compare id., with Gans Decl.
Exhs. A (showing a copy of the webpage titled "Deutsche Bank -
Location Finder"), J (showing a copy of DB AG's registration
document).) The name and logo appear directly above and in larger
font than DB Privat's own name and address. Third, the business
cards of Ulas Erkan and Mehmet Girgin, the DB Privat employees who
met with Nuccio, bore the same logo. (Nuccio Decl. Exh. H.) Taken
as true, these facts state a claim that Newbridge's belief was
reasonable and that DB Privat acted with ostensible authority.

**ii. Failure to honor Letter of Credit**

20

1    California Commercial Code § 5108(a) provides that "an issuer

2 [of a letter of credit] shall honor a presentation that . . .

3 appears on its face strictly to comply with the terms and

4 conditions of the letter of credit. . . . [A]n issuer shall

5 dishonor a presentation that does not appear so to comply." <u>See</u>

6 <u>also</u> I.S.P. Rule 4.01(a) ("[d]emands for honour of a standby

7 [letter of credit] must comply with the terms and conditions of the

8 standby"). Under the strict compliance standard, followed by

9 California, the documents presented by the beneficiary to a letter

10 of credit must comply word for word with the specifications set

11 forth in the letter of credit. 7 Bus. & Com. Litig. Fed. Cts. §

12 82:29 (3d ed.). The strict compliance standard is justified by the

13 ministerial nature of the issuer's role in the transaction; to

14 require the issuer "to determine the materiality of discrepancies

15 would be inconsistent with that [ministerial] function." <u>Id.</u> Both

16 NFC and DB AG agree that Newbridge was subject to the strict

17 compliance standard when it presented its documents to the DB AG

18 counter in New York. (<u>See</u> Opp. to DB AG 18:2-3; DB AG Motion 12:2-

19 5.)

20    The LOC issued by DB Privat describes the types of documents

21 that may be presented and provides where the documents may be

22 presented: "All documents to be presented to <u>us</u> shall be sent to us

23 in person or by an internationally recognized courier service at

24 the following address or at any of our counters <u>or any counters of</u>

25 <u>Deutsche Bank AG worldwide</u> . . . ." (Nuccio Decl. Exh. J (emphasis

26 added).) The LOC's language, written and issued by DB Privat,

27 indicates that presentation to either DB Privat (<u>i.e.</u>, "us") or DB

28 AG is acceptable.

DB AG, however, argues that it "possessed no obligation in connection with the Letter of Credit. Simply put, even if the Letter of Credit had been legitimate (which is disputed), DB AG was not required to pay upon a presentation to it or to DB Privat. Only DB Privat would possibly have the duties and liabilities of an 'issuer' under the purported Letter of Credit" since the LOC indicates that DB Privat was the issuer.[6] (DB AG Motion 12:7-13.)

The court disagrees. The court has already found that the Complaint sufficiently alleges that DB Privat acted as either the alter ego or the ostensible agent of DB AG. Should NFC ultimately prove either of these relationships, the obligations belonging to DB Privat, as issuer of the LOC, would also belong to DB AG. Accordingly, if the LOC was validly issued, then NFC has made a plausible claim against DB AG for failure to honor the LOC.

### iv. Negligence

The Complaint asserts that "Deutsche Bank had duties to the public, inter alia: (a) not to employ people suspected of criminal activities in position in which they can cause harm to third parties; and (b) to ensure that their agents and employees did not use Deutsche Bank to commit, or aid and abet, fraud or other wrongful acts." (Compl. ¶ 46.)

It further asserts that "Deutsche Bank negligently breached its duties by, inter alia: (a) continuing to employ Girgin and

---

[6] The face of the LOC indicates that DB Privat was the issuer. The name and address of DB Privat appear in the top right corner of each page of the LOC and at the bottom of the second page immediately after the text of the LOC ends and immediately before the signatures of Girgin and Erkan. In addition, the name and address are stamped onto the very bottom of the second page. (Nuccio Decl. Exh. J.)

1  Erkan in positions in which they dealt with the public and could

2  cause harm to third parties; (b) failing to monitor or supervise

3  Girgin's and Erkan's activities adequately; and (c) failing to

4  restrict or control Girgin's or Erkan's activities." (Compl. ¶ 47.)

5  Finally, it asserts that "[a]s an actual and proximate result

6  of the negligence of Deutsche Bank, NFC is entitled to recover

7  damages in an amount to be proved at trial together with interest

8  thereon." (Compl. ¶ 48.)

9  DB AG argues that NFC's allegations fail to state a plausible

10  claim for negligence for three reasons: (1) NFC does not allege

11  that DB AG owed NFC "any specific duty," (DB AG Motion 17:12-13);

12  (2) NFC does not allege that "Girgin and Erkan engaged in wrongful

13  activity or that they did so on DB AG's watch," (id. at 17:16-17);

14  and (3) NFC does not allege that "it suffered any damage as a

15  result of DB AG's alleged negligence," (id. at 17:19-20).

16  The court has already found that NFC has sufficiently pled

17  alter ego and ostensible agency. Thus, DB AG's first two arguments

18  are unpersuasive. The third argument asserts that being "entitled

19  to recover damages" does not equate to an allegation that NFC was

20  damaged. The Complaint, however, alleges that DB Privat induced

21  Newbridge to complete the transaction with Bayrakkale, resulting in

22  a loss to Newbridge of $5.93 million.(Compl. ¶¶ 8, 12, 13, 15, 36.)

23  Accordingly, the court finds that NFC has sufficiently pled a cause

24  of action for negligence.

25  **V. Negligent Misrepresentation**

26  Pointing to Federal Rule of Civil Procedure 9(b), DB AG argues

27  that NFC must state with particularity the circumstances

28  constituting fraud, a higher standard than plausibility. (DB AG

23

Motion at 13.)  NFC argues negligent misrepresentation is not
subject to a heightened pleading standard, but that under any
standard, "it has satisfied its pleading burden."  (Opp. to DB AG
at 20.)

    "The Ninth Circuit has not yet decided whether Rule 9(b)'s
heightened pleading standard applies to a claim for negligent
misrepresentation, but most district courts in California hold that
it does."  <u>Villegas v. Wells Fargo Bank  N.A.</u>, 2012 WL 4097747
(N.D. Cal September 12, 2012).  Here, the court need not take a
position because, regardless, NFC has satisfied the particularity
requirement.

    DB AG argues that NFC fails to state a claim for negligent
misrepresentation on three grounds. First, DB AG claims that NFC
does not meet the particularity requirement because the
misrepresentations NFC alleges were not made by DB AG.  (DB AG
Motion at 14.)  DB AG points to the LOC's letterhead and claims it
was issued by only DP Privat. (<u>Id.</u>) NFC, however, claims the LOC
and other communications were made by both DB AG and DB Privat.
(Opp. to DB AG at 20.)  NFC contends the LOC is on DB AG's
letterhead and DB AG is the agent of DB Privat.  (<u>Id.</u>)

    The court is not persuaded DB AG's argument.  As stated
above, the court finds NFC sufficiently pleaded that DB Privat is
DB AG's ostensible agent. If this is later proved, DB AG is bound
by the actions of its agent. Therefore, if NFC has sufficiently
pleaded negligent misrepresentation against DB Privat, then NFC
has stated a claim against DB AG.

    In pleading negligent misrepresentation NFC states

24

"Deutsche Bank made representations that: (1) the Letter of Credit was ready to be issued; (2) a valid letter of credit was issued and; (3) Girgin and Erkan had authority to act in connection with the Letter of Credit, including the authority to execute the Letter of Credit." (Compl. ¶ 37.) The court finds that NFC points to and provides documents which it alleges to contain misrepresentations by DB Privat and their employees, Girgin and Erkan.

Second, DB AG argues that the alleged communications prior to the LOC could not have been "reasonably relied upon as they were merely precatory." (DB AG Mot. at 14.) NFC contends it reasonably relied on the communications prior to the LOC because those communications "induced Newbridge to wire $5,930,000 to the escrow account." (Opp. to DB AG at 20.)

The court finds NFC pleaded with particularity that Newbridge relied on the communications prior to the LOC. NFC states, "[i]f Newbridge had known of the falsity of the foregoing representations, it would not have continued to conduct business with Bayrakkale and would not have made the Newbridge Deposit." (Compl. ¶ 37.) NFC pleads that it relied on each communication as it went forward in making the Newbridge deposit.

Third, DB AG argues that NFC may not twist a contractual claim into a tort claim. (DB AG Mot. at 15.) NFC contends it is not twisting a contractual claim into a tort claim because its tort claims are "premised on the absence of a contract." (Opp. to DB AG at 21.) Thus, if the court later finds there is no valid contract, NFC will only have tort claims. The court agrees that NFC pleaded its contract and tort claims in the alternative.

1    Accordingly, the court finds NFC has sufficiently pleaded,

2    with particularity, a claim for negligent misrepresentation.

3                    **vi. Aiding and abetting fraud**

4    As with DB AG's other arguments, this one depends on the

5    assertion that DB AG and DB Privat are separate entities. The

6    Ninth Circuit has observed that "[a]iding and abetting liability

7    under California law, as applied by the California state courts,

8    requires a finding of actual knowledge . . . ." <u>In re First</u>

9    <u>Alliance Mortg. Co.</u>, 471 F.3d 977, 993 (9th Cir. 2006). The

10   Complaint alleges that "Deutsche Bank knew that Bayrakkale was

11   committing a fraud . . . ." (Compl. ¶ 41.) DB AG challenges the

12   sufficiency of the Complaint, asserting that it failed "to provide

13   an explanation of how DB AG actually knew of defendant

14   Bayrakkale's alleged fraud." (DB AG Motion 16:4-5.)

15   As discussed, the Complaint alleges that Girgin and Erkan, as

16   employees of DB Privat, issued the LOC and, in addition, that DB

17   Privat acted as the alter ego or ostensible agent of DB AG. The

18   court therefore finds that NFC has sufficiently pled a cause of

19   action for aiding and abetting Bayrakkale's fraud.

20   Accordingly, the court DENIES DB AG's Motion to Dismiss.

21           **B. DB Privat's Motion to Dismiss**

22               **1. Forum Non Conveniens**

23   DB Privat, like DB AG, argues that this case should be

24   dismissed on the ground of forum non conveniens and invokes

25   arguments similar to those in DB AG's Motion. To satisfy the first

26   prong, DB Privat notes that it, as a German corporation, "is

27   indisputably subject to service of process in Germany." (DB Privat

28   Reply 17:15-16.) With regard to the private factors, DB Privat

1   asserts that "the vast majority of evidence and witnesses are in
2   Germany" and emphasizes that the meetings between Nuccio and
3   Girgin and Erkan occurred in Germany. (<u>Id.</u> at 18:1-7.) In
4   considering the public factors, DB Privat argues that "the
5   interests of Germany greatly outweigh those of a court sitting in
6   California," (<u>id.</u> at 18:22-23), that German law should apply to
7   the majority of legal issues, (<u>id.</u> at 19:1-2), and that this case
8   would unnecessarily burden the court, (<u>id.</u> at 19:9-10).

9        For the reasons discussed above, the court finds that DB
10  Privat, like DB AG, has not met its burden. Accordingly, the court
11  DENIES DB Privat's Motion to Dismiss on the ground of forum non
12  conveniens.

13                     **2. Personal Jurisdiction**

14                        **i. Specific jurisdiction**

15       A nonresident defendant has sufficient minimum contacts with
16  a forum to be subject to its specific jurisdiction when the
17  following criteria are met:

18       (1) The non-resident defendant must purposefully direct
19       his activities or consummate some transaction with the
20       forum or resident thereof; or perform some act by which
21       he purposefully avails himself of the privilege of
22       conducting activities in the forum, thereby invoking the
23       benefits and protections of its laws;
24       (2) the claim must be one which arises out of or relates
25       to the defendant's forum-related activities; and
26       (3) the exercise of jurisdiction must comport with fair
27       play and substantial justice, i.e. it must be
28       reasonable.

1   Wash. Shoe Co. v. A-Z Sporting Goods Inc., 704 F.3d 668, 672 (9th
2   Cir. 2012).

3                        **a. Purposeful direction**

4        Where intentional torts are alleged, the purposeful direction
5   component may be satisfied by the "effects" test established in
6   Calder v. Jones, 465 U.S. 783 (1984). Taking the Complaint's
7   factual allegations as true, the court finds that DB Privat is
8   subject to the court's specific jurisdiction under the test.

9        In Calder, the Court concluded that "[a]n individual injured
10  in California need not go to Florida to seek redress from persons
11  who, though remaining in Florida, knowingly cause the injury in
12  California." Id. at 790. The Court found that the defendant could
13  "reasonably anticipate being haled into court" in California
14  because "their intentional, and allegedly tortious, actions were
15  expressly aimed at California," where they knew that "the brunt of
16  the injury would be felt" and "would have a potentially
17  devastating impact." Id. at 789-90.

18       The Ninth Circuit has refashioned Calder into a three-part
19  test: (1) whether the defendant committed an intentional act; (2)
20  whether the act was "expressly aimed" at the forum state; and (3)
21  whether the act caused harm that the defendant knew was likely to
22  be suffered in the forum state. Wash. Shoe Co., 704 F.3d at 673.

23       DB Privat argues that NFC "has not alleged any facts to
24  satisfy either of the first two prongs of the Calder 'effects'
25  test, i.e. that DB Privat committed an intentional act expressly
26  aimed at California." (Id. at 8:17-19.) The court disagrees.

27       The intentional acts at issue here are DB Privat's
28  representations that it was going to issue a letter of credit and

28

1   its issuance of the LOC. The Complaint alleges that on January 12,

2   2011, DB Privat "wrote a letter to Bayrakkale stating that its

3   request . . . was being processed and that it expected to issue

4   the letter of credit the following week." (Compl. ¶ 12.)

5   Bayrakkale then forwarded the letter to Newbridge and the Escrow

6   Agent. (Id.) The Complaint next alleges that on January 26, Nuccio

7   "went to the offices of Deutsche Bank in Dortmund, Germany, where

8   he received an original, executed letter confirming that the

9   Letter of Credit was ready to be issued and would be ready for

10  collection" the next day. (Id. ¶ 13.) Nuccio then notified

11  Newbridge and Bayrakkale. (Id.) The next day, Nuccio allegedly

12  returned to the Dortmund office, received the LOC, and again

13  notified Newbridge and Bayrakkale. (Id. ¶ 15.)

14      Nuccio's declaration supports this account. He describes

15  going to the Dortmund office on January 26 with representatives

16  from Bayrakkale to meet Erkan and Girgin. (Nuccio Decl. ¶ 12.) He

17  describes forwarding a letter signed by Girgin later that day to

18  Newbridge and Bayrakkale. (Id. ¶¶ 13-14.) He then describes

19  returning the next day to collect the issued LOC. (Id. ¶ 15.)

20      Because DB Privat knew that Newbridge—the LOC's sole

21  beneficiary—was a California resident, the court finds that the

22  Complaint sufficiently alleges that DB Privat aimed its

23  intentional acts at California for the purpose of causing harm it

24  knew would be felt in California.

25                  **b. Arising out of**

26      Where the causes of action arise out of the defendant's

27  intentionally tortious conduct, the plaintiff has sufficiently

28  alleged minimum contacts with the forum. For example, "the

inducement of reliance in California is a sufficient act within California to satisfy the requirement of minimum contacts where the cause of action arises out of that inducement." <u>Paccar International, Inc. V. Commercial Bank of Kuwait, S.A.K.</u>, 757 F.2d 1058, 1064 (9th Cir. 1985) (alteration omitted) (quoting <u>Data Disc, Inc. V. Systems Technology Associates, Inc.</u>, 557 F.2d 1280, 1288 (9th Cir. 1977)).

Here, NFC's causes of action against DB Privat arise out of Newbridge's reliance on the January 12 and January 26 letters and the LOC. DB Privat allegedly induced that reliance. Accordingly, NFC has sufficiently alleged that DB Privat has sufficient minimum contacts with California.

### c. Reasonableness

"[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 477 (1985). To determine whether the exercise of jurisdiction is reasonable, the Ninth Circuit considers seven factors:

> (1) the extent of the defendants' purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of the conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to

1   the plaintiff's interest in convenience and effective

2   relief; and (7) the existence of an alternative forum.

3   CollegeSource, Inc. v. AcademyOne, Inc., 653 F.3d 1066, 1079 (9th

4   Cir. 2011) (quoting Dole Food Co. v. Watts, 303 F.3d 1104, 1114

5   (9th Cir. 2002)); see also Burger King, 471 U.S. at 477.

6       The parties dispute the reasonableness of exercising

7   jurisdiction over DB Privat. (Compare DB Privat Motion 10:9-11,

8   with Opp. to DB Privat 21-24.) The court finds that DB Privat has

9   not made a sufficiently compelling case to render jurisdiction

10  unreasonable.

11      The first factor favors exercising jurisdiction. DB Privat

12  argues that it "has not purposefully injected itself into the

13  forum state's affairs. It is a German company doing business in

14  Germany for the German market." (DB Privat Motion 10:10-11.)

15  However, "[a]ctions directed at a forum resident expected to cause

16  harm in the forum constitute purposeful injection." CollegeSource,

17  653 F.3d at 1080. Though DB Privat resides and primarily conducts

18  business in Germany, the Complaint alleges that DB Privat

19  purposefully directed its tortious activities at a California

20  resident.

21      Though the second and sixth factors oppose each other in

22  theory, on balance here they favor exercising jurisdiction. The

23  court acknowledges the burden potentially imposed on DB Privat by

24  requiring it to defend in California, (see DB Privat Motion 10:12-

25  16), but also recognizes that DB Privat is the subsidiary of a

26  large international bank with offices worldwide. The court also

27  realizes that denying jurisdiction to NFC's claims would not only

28

1  inconvenience NFC but would likely force NFC to file in Germany,

2  the limitations of which have been discussed above.

3       Similarly, the third and fourth factors, on balance, favor

4  jurisdiction. The court recognizes the interest that German courts

5  likely have in adjudicating a dispute involving a German financial

6  institution. (See DB Privat Reply 17:19-20.) However, California

7  has an interest in providing its residents a forum for relief.

8  (See Opp. to DB Privat 22:27-23:2.) The court notes that the

9  parties agreed to a California choice-of-law clause. Indeed, DB

10 Privat appears to have agreed to California law after initially

11 proposing German law. (Compare Nuccio Decl. Exh. A, with id. Exh.

12 J.) Though a choice-of-law clause differs from a choice-of-forum

13 provision, in conjunction with the other factors, it adds to the

14 reasonableness of exercising jurisdiction.

15      In considering the fifth factor, NFC argues that "the most

16 important witnesses . . . are Vincent Nuccio, the escrow agent;

17 Dan Mandel, former executive of Newbridge; Noah Fogelson, former

18 President of Crest; Loeb & Loeb, Newbridge's counsel; [and] Scott

19 Frank, a producer . . . ." (Opp. to DB Privat 23:8-13.) DB Privat

20 responds that these witnesses "have no knowledge related to the

21 claims against DB Privat, with the possible exception of Nuccio

22 (who is not even in California)." (DB Privat Reply 16:12-13.) The

23 court recognizes that Girgin, Erkan, and Nuccio, along with other

24 employees of DB Privat, may be important witnesses. However, DB

25 Privat is unable to confirm that Girgin and Erkan remain in

26 Germany. (See Peschkes Decl. ¶ 18 ("To the best of my knowledge,

27 they both still reside in Germany.").) International disputes such

28 as this one subject judicial efficiency to the geography of the

parties, witnesses, and evidence, and the court is not persuaded
that judicial efficiency would be better served in a German court.

In sum, the court finds that exercising its personal
jurisdiction over DB Privat is reasonable. The court therefore
DENIES DB Privat's Motion to Dismiss on the ground of personal
jurisdiction.

**IV. Conclusion**

For the above reasons, the court DENIES DB AG's and DB
Privat's Motions to Dismiss.

IT IS SO ORDERED.

Dated: July 2, 2013

DEAN D. PREGERSON
United States District Judge